# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUSTER ACQUISITION CO., LLC, <br><br> Plaintiff, <br><br> v. <br><br> NORTH HUDSON SEWERAGE AUTHORITY, <br><br> Defendant. | Civil Action No. 12-3427 (JLL) <br><br> **OPINION** |

**LINARES,** District Judge.

This case involves allegations that Defendant, North Hudson Sewerage Authority ("the Authority"), breached, *inter alia*, the Exclusivity Provision of an agreement it entered into with Plaintiff, Juster Acquisition Co., LLC ("Juster"), when it restructured and refinanced its 2003 leveraged lease debt with an entity other than Juster during the parties' agreed-upon eighteen (18) month exclusivity period. Currently before the Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff moves for summary judgment on its breach of contract and breach of the implied covenant of good faith and fair dealing claims. Defendant moves for summary judgment as to all claims asserted in Plaintiff's Complaint: breach of contract; breach of the implied covenant of good faith and fair dealing; restitution and unjust enrichment; and quantum meruit. The Court has considered the submissions made in support of and in opposition to the instant motions. No oral argument was

heard. Fed. R. Civ. P. 78. Based on the reasons that follow, **Plaintiff's motion is granted in part and denied in part** and **Defendant's cross-motion is granted in part and denied in part.**

## BACKGROUND

The following relevant facts are not in dispute unless noted otherwise.[1] In July 2011, the Authority issued a Request for Qualifications ("RFQ") to restructure and refinance the

---

[1] Defendant's Responsive 56.1 Statement fails to comply with the requirements of the Local Rule by failing to specify any portions of Plaintiff's statements that are agreed upon, and by responding with factual denials couched as assumptions and legal argument. *See, e.g.*, Def. Responsive 56.1 Stmt., 5 ("This language shows that the authorization did not extend beyond the private equity transaction described in the RFQ materials."). In particular, Defendant has "disputed" each and every material fact contained in Plaintiff's 56.1 Statement. What is most troubling to the Court, however, is that it is clear that Defendant does not, in fact, "dispute" every aspect of every one of Plaintiff's statements of material facts. For example, in paragraph 1 of its 56.1 Statement, Plaintiff asserts: "In July of 2011, the NHSA issued a Request for Qualifications to restructure and finance the NHSA's senior debt from a 2003 leveraged lease financing. " (Pl. 56.1 Stmt., 1). In response, Defendant states: "Disputed. The NHSA in its July 2011 Request for Qualifications ("RFQ") sought to restructure and refinance the NHSA's senior debt from a 2003 leveraged lease financing. The RFQ, however, was limited in scope. It did not contemplate an ordinary bond issue transaction but instead concerned working with an "Investor" . . . . (Def. Responsive 56.1 Stmt., 1). Based on this response—and on evidence contained in the record—there is <u>no</u> dispute that the NHSA issued a Request for Qualifications in July 2011 to restructure and refinance the NHSA's senior debt from a 2003 leveraged lease financing. Defendant defeats the spirit and purpose of Local Civil Rule 56.1 by failing to indicate to the Court, in its responsive statement, that this aspect of Plaintiff's statement is agreed upon. Similarly, paragraph 2 of Plaintiff's 56.1 Statement states: "On August 4, 2011, Juster provided a response to the NHSA's Request for Qualifications." (Pl. 56.1 Stmt., 1). In response, Defendant writes: "Disputed. On August 4, 2011, Juster responded to the RFQ. However, Juster referred to the transaction as involving an "investor" consisting of a "special purpose vehicle" . . . . (Def. Responsive 56.1 Stmt., 2). Once again, it is clear based on this response, that there is no dispute as to the fact that Juster provided a response to the NHSA's Request for Qualifications on August 4, 2011. Defendant engages in a similar practice throughout its Responsive 56.1 Stmt. Although the Court could have stricken Defendant's entire Responsive 56.1 Statement on this basis, or in the alternative deemed each of Plaintiff's statement of material facts as admitted, in the interests of fairness and judicial economy, the Court has made every effort to decipher

Authority's senior debt from a 2003 leveraged lease financing. (Pl. 56.1 Stmt., 1; Def. Responsive 56.1 Stmt., 1). The July 2011 RFQ provided that:

> It is the Authority's intent to select an Investor that the Authority will negotiate with to restructure and refinance the 2003 Leveraged Lease on the Collection System.
>
> ***
>
> Please provide background information on your organization, the source* and amount of capital available to invest in projects overall, and a brief synopsis of the history of your investment activities. How does the Authority's proposed transaction relate to the other investment activities you are or intend to engage in? Do you have an interest in pursuing other similar opportunity with municipal water and wastewater authorities or will this be a standalone investment in your portfolio?
>
> ***
>
> Please provide an estimate—subject to refinement and therefore NOT final—of the amount of cash that you expect to invest in the Lease, and the amount of debt financing that you anticipate investing. The overall intent of this request is to get an approximation of your intended equity/debt structure and will not be taken as the "final" number.

(Hand Cert., Ex. D).

On August 4, 2011, Juster provided a response to the Authority's RFQ, which proposed "a newly formed Special Purpose Vehicle sponsored by the principles of Juster Acquisition Co., LLC/Century Commercial, LLC" as the "Investor." (Pl. 56.1 Stmt., 2; Def. Responsive 56.1 Stmt., 2); (Epstein Cert., Ex. 7). Juster's response also stated: "Thank you for the opportunity to work with the North Hudson Sewage Authority ("NHSA") in restructuring and refinancing the 2003 Leveraged Lease on the Collection System ("Lease")." (Epstein Cert., Ex. 7).

---

which aspects of Plaintiff's 56.1 Statement are, in fact, disputed, and which are agreed upon. That being said, any statement, or portion thereof, that is not clearly denied—in **substance**, not merely with the label "disputed"—and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted. *See* L. Civ. R. 56.1.

The Authority ultimately selected Juster pursuant to the Request for Qualifications. (Pl. 56.1 Stmt., 3; Def. Responsive 56.1 Stmt., 3); (Epstein Cert., Exs. 8, 9). On October 20, 2011, a Resolution was passed by the North Hudson Board of Commissioner's authorizing the restructuring of the 2003 lease transaction by Juster. (Epstein Cert., Ex. 3 at 100:14-22; Ex. 9).

Mr. Michael Geffrard of the LIATI Group, LLC served as the Authority's financial advisor in connection with the transaction set forth in the RFQ. (Pl. 56.1 Stmt., 4; Def. Responsive 56.1 Stmt., 4). Mr. Geffrard, Fred Pocci (the Authority's Executive Director), and Frank Leanza (the Authority's General Counsel) were generally responsible for negotiating the terms of the Term Sheet with Juster. (Pl. 56.1 Stmt., 5; Def. Responsive 56.1 Stmt., 5); (Epstein Cert., Ex. 3 at 109:10-110:3; Ex. 6 at 91:7-92:22; Ex. 9).

The parties executed the Term Sheet in November 2011. (Pl. 56.1 Stmt., 6; Def. Responsive 56.1 Stmt., 6). However, a different version of the Term Sheet was signed by each of the parties. (Def. 56.1 Stmt., 5-7; Pl. Responsive 56.1 Stmt., 5-7). In particular, Mr. Pocci, Executive Director of the Authority, executed the signature page of version 10 of the Term Sheet but attached the signature page to version 9. Eric Derfner of Juster signed the same signature page for version 10, but attached the fully executed signature page to version 10 of the Term Sheet. (*Id.*).

Both versions (9 and 10) of the Term Sheet define the Contemplated Transaction as follows:

> In order to recapitalize the North Hudson Sewerage Authority (the "Authority" or "NHSA"), Issuer will either (a) acquire, amend and restate the Head Lease Agreement dated September 30, 2003 between the Authority and NHSA Leasing Trust . . . ., or (b) terminate the aforementioned head lease and enter into a new head lease of the System with the Authority . . . .

4

(Hand Cert., Exs. G and I). Both versions (9 and 10) of the Term Sheet contain an identical

Exclusivity Provision, which provides:

> Exclusivity: The Authority agrees to work exclusively with Juster on the restructuring and refinancing of the Authority's 2003 leveraged lease and will neither solicit other offers nor disclose any of the terms herein for a period of 18 months from the date of execution of this Term Sheet. The parties agree to work diligently and in good faith to conclude this financing as quickly as possible. This grant of exclusivity shall not in any way impede the Authority from engaging in other capital raising activities that are part of its ongoing capital investment program, nor from doing any other activities necessary for its efficient and cost effective operations. This period of exclusivity will be deemed to expire if Juster unilaterally and unreasonably withdraws from pursuing this transaction with the Authority. By way of example, the Purchase Amount, BRP and use of Issuer bond proceeds described herein were determined based upon certain assumptions regarding yield on the Issuer's bonds. If market yields at the time the transaction is priced are higher, the closing may be delayed or the parties may negotiate changes without terminating exclusivity.

(Pl. 56.1 Stmt., 8-9; Def. Responsive 56.1 Stmt., 8-9); (Hand Cert., Ex. G (signed by Frederic

Pocci of the Authority); Ex. I (signed by Eric Derfner of Juster); Ex. V). The signature page of

the Term Sheet further provides that:

> The terms herein are an estimate, subject to change and not final. All numbers, amounts and percentages herein are preliminary and subject to change. **This letter is not contractual in nature, and neither this letter nor any subsequent conduct of the parties . . . shall create or give rise to any legally binding obligation to lease, purchase, sell or any other legally binding obligation other than as described under "Exclusivity" above.** . . .

(*Id.*).

Between November 2011 and January 2012, Juster and its professionals[2] devoted substantial time and effort to develop and implement the restructuring and refinancing of the Authority's senior debt associated with its 2003 leveraged lease, as contemplated in the Term Sheet. (Pl. 56.1 Stmt., 10; Def. Responsive Stmt., 10). In this regard, Juster and the Authority discussed three possible structures for refinancing: (1) a Rule 144A transaction (which refers to a 1990 administrative rule issued by the Securities and Exchange Commission ("SEC") allowing, under certain circumstances, for the trading of certain securities among institutional investors without registering the trade with the SEC); (2) a Section 3(a)(2) transaction (which provides for exemption from SEC registration for securities issued by, among other things, public instrumentalities pursuant to Section 3(a)(2) of the Securities Act of 1933); and (3) a Certificates of Participation ("COPs") transaction (wherein an investor purchases a share of lease revenues rather than a bond secured by those revenues). (Pl. 56.1 Stmt., 11; Def. Responsive 56.1 Stmt., 11); (Epstein Cert., Ex. 2 at No. 37). In or around December 2011, the Authority advised Juster that they did not want to proceed with a COPs transaction. (Id.; Epstein Cert., Ex. 24; Ex. 27 at 51:21-53:3; Ex. 29).

At some point in the fall of 2011, the Authority had retained Dennis J. Enright of NW Financial Group LLC to assist in the refinancing transaction. (Epstein Cert., Ex. 2 at No. 50). On December 20, 2011, Mr. Enright sent a letter to Mr. Pocci stating that: "In accordance with our discussion earlier today, NW Financial Group will advise yourself and the Chairman on the proposed restructuring of your existing lease transaction. . . . We will provide these services for a flat fee of $150,000 . . . ." (Pl. Responsive 56.1 Stmt., 15); (Epstein Cert., Ex. 49).

---

[2] In particular, in its Response to the RFQ, Juster indicates that it retained the services of Jefferies & Company, Mitsubishi UFJ Securities (USA), and the law firm of Orrick, Herrington & Sutcliffe, LLP. (Epstein Cert., Ex. 7).

In or around January 2012, Juster and its professionals provided to the Authority drafts of the Preliminary Official Statement, Head Lease, Master Lease Agreement, and an Indenture of Trust and Security Agreement. (Pl. 56.1 Stmt., 12-13; Def. Responsive 56.1 Stmt., 12-13); (Epstein Cert., Ex. 6 at 139:18-140:2; Ex. 33). Juster coordinated—and proceeded towards—a January 2012 closing date for the refinance. (*Id.*; Epstein Cert., Ex. 6 at 32:12-15; Ex. 40:22-41:7).

On January 19, 2012, Ed Markus of the Amawalk Consulting Group LLC, the Authority's Financial Feasibility Consultant for the proposed lease transaction, submitted a letter report to Mr. Richard Wolff, Chairman of the Authority, and Mr. Pocci, its Executive Director, wherein he stated: "Under the transaction proposed in December 2011, the overall savings were greater and the savings occurred over a longer period of time; the aggregate increase in debt service under the December 2011 proposal was approximately $434 million, or $307 million less than the transaction as currently proposed." (Hand Cert., Ex. J). Mr. Wolff, Chairman of the Authority, testified that "that's when the deal from the perspective of the Authority, the board, had to have a second look." (Hand Cert., Ex. C at 99:24-100-12).

On January 20, 2012, the Authority suspended the closing date indefinitely. (Pl. 56.1 Stmt., 12; Def. Responsive 56.1 Stmt., 12); (Epstein Cert., Ex. 3 at 207:23-208:2; Ex. 6 at 140:3-24; Ex. 10 at No. 12).

By way of letter dated January 21, 2012, Mr. Markus withdrew his January 20, 2012 letter, indicating that "the information presented in our letter and attachment of January 19, 2012 is neither up-to-date nor valid." (Epstein Cert., Ex. 35).

On February 16, 2012, Mr. Geffrard sent an email to Mr. Pocci stating:

> This morning, I let the Derfner's [sic] know that Jack was changing his position on the COPS approach, but I haven't spoken

to either Eric or Ned as of yet to gauge their reaction to this news. This is a BIG departure from where the deal was and from the Terms Sheet that was originally executed by the parties. I am concerned that the Derfners could justifiably claim that they relied on Jack's previously stated and strongly held view that COPS didn't work and they expended significant time and money on that basis. The issue was initially raised in November, as I recall. By way of background, it was Jeffries who brought up a COPS structure as a way of helping to get a 3a-2 opinion. . . . My concern with the proposed business terms incorporated in this email is that it ignores the history of the deal and could be construed as not being consistent with the good faith exhibited by all sides in working toward a resolution on the cost issues. . . If these are my instructions, I will faithfully carry them out, but I would respectfully suggest a different and more collaborative approach.

(Pl. 56.1 Stmt., 17; Def. Responsive 56.1 Stmt., 17); (Epstein Cert., Ex. 29).

On February 24, 2012, Mr. Enright, of NW Financial, sent an e-mail stating: "Jusy [sic] got a call from Fred [Pocci], he says we are all on the same page now, COPs all the way. . . ." (Pl. 56.1 Stmt., 15; Def. Responsive 56.1 Stmt., 15); (Epstein Cert., Ex. 39; Ex. 40 at 179:1-5). On February 27, 2012, Mr. Enright sent Mr. Pocci an email attaching a "Certificates of Participation, Series 2012 Finance Timeline," which provided for a closing date of May 24, 2012. (*Id.*); (Epstein Cert., Ex. 41). On March 8, 2012, Mr. Enright sent an email to two other individuals at NW Financial stating, in pertinent part, that "we have convinced North Hudson to abandon a planned private lease deal and do a COPs deal." (Epstein Cert., Ex. 43).

On March 6, 2012, Mr. Wolff sent an email to Mr. Pocci stating that: "Maybe we should just do the COPS deal and bring the issue with Derfner to a head by telling him we are doing a traditional deal which does not fall under the exclusivity." (Epstein Cert., Ex. 42).

On March 7, 2012, the Authority held a COPs kickoff meeting at its offices in Hoboken; neither of Juster's members—Eric and Justin Derfner—were invited to attend this meeting. (Pl. 56.1 Stmt., 16; Def. Responsive 56.1 Stmt., 16); (Epstein Cert., Ex. 42). According to Mr.

Pocci, Juster was not invited to attend this meeting because it had never submitted a proposal for a COP deal. (Hand Cert., Ex. B, Pocci Dep. Tr. at 369:5-370:8). Mr. Pocci acknowledged, however, that Juster had never refused—either orally or in writing—to participate in a COPs deal. (*Id*. at 371:20-372:10).

As of early May 2012, the Authority was still actively considering financing through Juster. (Def. Responsive 56.1 Stmt., 15); (Hand Cert., Ex. BB).

On May 24, 2012—six months into Juster's eighteen-month exclusivity period—the Authority closed on a COPs transaction with NW Financial, restructuring and refinancing the same debt at issue in the Exclusivity Provision. (Pl. 56.1 Stmt., 19; Def. Responsive 56.1 Stmt., 19); (Epstein Cert., Ex. 2 at No. 53).[3] Juster did not participate in the May 24, 2012 closing, nor did it receive any monies from that transaction. (*Id*.). In providing its services to the Authority, Juster incurred expenses of not less than $590,682.56. (Pl. 56.1 Stmt., 20; Def. Responsive 56.1 Stmt., 20). Moreover, under the terms of the proposed restructuring and refinancing with Juster that was set to close in or around January 2012, Juster would have received monies from the lease payments to be made by the Authority. Because the Authority restructured and refinanced without Juster, Juster did not receive such payments. (Pl. 56.1 Stmt., 22; Def. Responsive 56.1 Stmt., 22).[4]

---

[3] Although Defendant indicates "Disputed," Defendant does not actually dispute that on or about May 24, 2012, the Authority closed on a COPs transaction with NW Financial which restructured and refinanced the same debt referred to in the Exclusivity Provision. Certainly Defendant cites to no evidence refuting the foregoing statement; thus, it is deemed admitted. The crux of Defendant's dispute appears to be as to Plaintiff's use of the word "governed"—i.e., whether the Exclusion Provision covered (or "governed") any type of restructure and refinance of the Authority's 2003 leveraged lease debt or whether it covered only the restructure and refinance of such debt through a private equity transaction.

[4] Although the Court has already indicated that Defendant's Responsive 56.1 Statement fails to comply with Local Civil Rule 56.1, it bears noting that Defendant's response to paragraph 22 of Plaintiff's Statement of Material Facts is entirely inappropriate. Although Defendant indicates

In light of the foregoing, Plaintiff commenced the instant cause of action in June 2012. This Court's jurisdiction over Plaintiff's Complaint is premised on 28 U.S.C. § 1332(a). Plaintiff's Complaint asserts four (4) causes of action: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) restitution and unjust enrichment, and (4) quantum meruit.

---

"disputed," nowhere in Defendant's three paragraph response does Defendant actually dispute or deny the particular statement of fact set forth by the Plaintiff. Rather, Defendant provides a narrative of why the Authority chose not to proceed with Juster. For obvious reasons, and those already discussed herein, this is not a proper response to a statement of fact. *See, e.g., Owens v. Am. Hardware Mut. Ins. Co.*, No. 11-6663, 2012 WL 6761818, at * 3 n. 4 (D.N.J. Dec. 31, 2012) ("The proper response to a procedurally correct Rule 56 motion is to file a counter statement that denies the fact is material, admits the material fact, or denies the material fact by counter proofs conforming to the rules of evidence."). Although the Court has done its best to sift through Defendant's lengthy responses, and the evidence cited therein, to determine which aspects—if any—of Plaintiff's statement of facts is, in fact, disputed or denied, the Court reiterates that this defeats the purpose and spirit of Local Civil Rule 56.1; thus, any statement that is not explicitly denied with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted. *See* L. Civ. R. 56.1. As noted by the Honorable Noel Hillman, U.S.D.J.:

> The parties are reminded that Local Civil Rule 56.1 serves an important purpose both procedurally and substantively. It focuses the parties on the facts material to the dispute. It allows the court, with the help of the parties, to isolate those facts for the purpose of applying the appropriate legal standard or controlling precedents. Without compliance with the Rule, the Court is left to sift through often voluminous submissions in search of-sometimes in vain-the undisputed material facts. In short, if the parties do not provide the appropriate statements and respond forthrightly to their opponent's submissions, the process of summary judgment breaks down.

*Owens*, 2012 WL 6761818, at * 3.

## LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson,* 477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

With this framework in mind, the Court turns now to the parties' motions.

## ANALYSIS

As previously stated, Plaintiff moves for summary judgment on its breach of contract and breach of the implied covenant of good faith and fair dealing claims. Defendant moves for summary judgment as to all claims asserted in Plaintiff's Complaint: breach of contract; breach of the implied covenant of good faith and fair dealing; restitution and unjust enrichment; and quantum meruit.

## A.    Plaintiff's Motion for Summary Judgment

### 1.    Count One—Breach of Contract

To state a claim for breach of contract under New Jersey law,[5] the plaintiff must allege facts demonstrating that: "(1) the parties entered into a valid contract, (2) the defendant did not perform his or her obligations under the contract, and (3) the plaintiff suffered damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007).    The New Jersey Supreme Court has held that "[a] contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.' " *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (internal quotation omitted).    Generally speaking, the formation of a contract enforceable at law occurs when the parties agree on essential terms and manifest an intent to be bound by those terms. *Id.* On the other hand, "[w]here the parties do not agree to one or more essential terms, . . . courts generally hold that the agreement is unenforceable." *Id.*

Unless contract terms are ambiguous, "[t]he interpretation or construction of a contract is usually a legal question for the court" that is appropriate for resolution on a summary judgment motion. *Driscoll Constr. Co. v. State*, 371 N.J. Super. 304, 305 (App. Div. 2004).    Additionally where terms of the agreement are "set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms . . . [, they] may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented ... by [the] course of performance [between the parties]." N.J. Stat. Ann. § 12A:2–202.    Clear terms may also not be altered by "the secret, unexpressed intent of a party . . .

---

[5] Since this Court exercises its diversity jurisdiction over this action, the law to be applied is that of the forum state—New Jersey. *See Am. Cyanamid Co. v. Fermenta Animal Health*, 54 F.3d 177, 180 (3d Cir. 1995)

[; a] party is bound by the apparent intention he or she outwardly manifests to the other party." *Domanske v. Rapid–American Corp.*, 330 N.J. Super. 241, 246 (App. Div. 2000).

The Court begins its analysis by noting that Plaintiff has come forward with evidence establishing that: (1) the parties entered into an agreement to be governed by an eighteen (18) month Exclusivity Provision, (2) the Exclusivity Provision provided that "The Authority agrees to work exclusively with Juster on the restructuring and refinancing of the Authority's 2003 leveraged lease and will neither solicit other offers nor disclose any of the terms herein for a period of 18 months from the date of execution of this Term Sheet," (3) Defendant ultimately restructured and refinanced its 2003 leveraged lease through an entity that was not Juster, and (4) this transaction occurred within the eighteen (18) month exclusivity period contemplated in the Exclusivity Provision. There is essentially no dispute as to the foregoing.

Defendant nevertheless urges the Court to deny Plaintiff's motion for summary judgment as to its breach of contract claim and/or to grant its cross-motion for summary judgment as to this claim for two overarching reasons. First, Defendant maintains that the Exclusivity Provision did not apply to the COPs transaction that Defendant ultimately entered into with NW Financial. Second, Defendant argues that the agreement at issue (containing the Exclusivity Provision) is, in any event, unenforceable because: it violates public policy; lacks proper offer and acceptance; is missing essential terms such as price; and was based upon a mutual mistake of tax law. In the alternative, Defendant argues that there are material issues of fact in dispute that preclude entry of summary judgment as to this claim. The Court will address each of Defendant's arguments, in turn.

### a. Scope of Exclusivity Provision

First, Defendant maintains that the plain language of the Term Sheet and its Exclusivity Provision demonstrates that the parties intended the Exclusivity Provision to apply only to the "private equity Contemplated Transaction" set forth in the RFQ and Term Sheet;[6] that the COPs transaction into which Defendant entered in May 2012 did not have such an equity investor; thus, Defendant is not bound—and did not breach—the Exclusivity Provision at issue. (Def. Br. at 25).

Versions 9 (signed by Pocci of the Authority) and 10 (signed by Derfner of Juster) of the Term Sheet both provide, in pertinent part:

> Contemplated Transaction:   In order to recapitalize the North Hudson Sewerage Authority (the "Authority" or "NHSA"), Issuer will either (a) acquire, amend and restate the Head Lease Agreement dated September 30, 2003 between the Authority and NHSA Leasing Trust . . . or (b) terminate the aforementioned head lease and enter into a new head lease of the System with the Authority. . . .
>
> ***
>
> Exclusivity:   The Authority agrees to work exclusively with Juster on the restructuring and refinancing of the Authority's 2003 leveraged lease and will neither solicit other offers nor disclose any of the terms herein for a period of 18 months from the date of execution of this Term Sheet. The parties agree to work diligently and in good faith to conclude this financing as quickly as possible. This grant of exclusivity shall not in any way impede the Authority from engaging in other capital raising activities that are part of its ongoing capital investment program, nor from doing any other

---

[6] (Def. Responsive 56.1 Stmt., 19). The Court notes that Defendant does not expressly define what constitutes a private equity transaction for the Court, nor does Defendant explain, in technical terms or otherwise, how a COPs transaction differs from a private equity transaction. Suffice it to say that there appears to be no dispute that the COPs transaction that Defendant ultimately entered into with NW Financial did not constitute either a Contemplated Transaction, as defined in the Term Sheet, or a private equity transaction. Because the Court finds, for the reasons discussed below, that the Exclusivity Provision at issue contained no express limitation to the Contemplated Transaction *or* to a private equity transaction, the Court need not delve into the technical logistics of whether and/or how a private equity transaction differs from a COPs transaction.

activities necessary for its efficient and cost effective operations. This period of exclusivity will be deemed to expire if Juster unilaterally and unreasonably withdraws from pursuing this transaction with the Authority. By way of example, the Purchase Amount, BRP and use of Issuer bond proceeds described herein were determined based upon certain assumptions regarding yield on the Issuer's bonds. If market yields at the time the transaction is priced are higher, the closing may be delayed or the parties may negotiate changes without terminating exclusivity.

*** 

The terms herein are an estimate, subject to change and not final. All numbers, amounts and percentages herein are preliminary and subject to change. **This letter is not contractual in nature, and neither this letter nor any subsequent conduct of the parties ... shall create or give rise to any legally binding obligation to lease, purchase, sell or any other legally binding obligation other than as described under "Exclusivity" above. . . .**

(Hand Cert., Ex. G (signed by Frederic Pocci of the Authority)); (Hand Cert., Ex. I (signed by Eric Derfner of Juster)).

There is no provision in the Term Sheet, or, in particular, in the binding Exclusivity Provision contained therein, limiting the restructuring and refinancing of the Authority's debt under the 2003 Leveraged Lease to a private equity deal or to the Contemplated Transaction, as Defendant suggests. Nor does the Court find the following provision to be ambiguous[7] in any way: "The Authority agrees to work exclusively with Juster on the restructuring and refinancing of the Authority's 2003 leveraged lease and will neither solicit other offers nor disclose any of the terms herein for a period of 18 months from the date of execution of this Term Sheet." (*Id.*).[8]

---

[7] "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. . . . To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their 'plain and ordinary meaning.' " *Nester v. O'Donnell*, 301 N.J. Super. 198, 210 (App. Div. 1997).

[8] To the extent Defendant asserts that there are other ambiguities in the Term Sheet, the Court finds that such alleged ambiguities do not directly relate or otherwise affect the terms of the Exclusivity Provision. Nor does the Court read any other provisions of the Term Sheet—

*See generally Estate of Cohen, ex rel. Perelman v. Booth Computers,* 421 N.J. Super. 134, 150 (App. Div. 2011) ("Whether a term of a contract is clear or ambiguous is a question of law."). Even accepting as true the general premise that the COPs transaction that the Authority eventually entered into with Plaintiff did not constitute either of the two options listed under "Contemplated Transaction" (as set forth above),[9] the Court finds that the Term Sheet is unambiguous when it states that the only "legally binding obligation" contained therein is the "Exclusivity Provision." The Exclusivity Provision makes no reference to the Contemplated Transaction, nor does it make reference to a private equity transaction.

New Jersey caselaw is clear in that: (1) contracts are generally given their plain and ordinary meaning, (2) when its terms are clear, courts must enforce the terms of the contract as written, and (3) "[a] court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument." *East Brunswick Sewerage Authority v. East Mill Assocs., Inc.,* 365 N.J. Super. 120, 125 (App. Div. 2004). Thus, because the Court finds that the Exclusivity Provision is clear and unambiguous, it must enforce its terms as written. Pursuant to the clear terms of the Exclusivity Provision, the only way that the Authority could have proceeded to restructure and refinance its debt under the 2003 leveraged lease agreement with an entity *other* than Juster during the 18-month period of exclusivity, without breaching said provision, is if Juster had "unilaterally and unreasonably" withdrawn from pursuing the transaction during said eighteen-month period. *See* Hand Cert.,

---

including but not limited to the section related to "Issuer Obligation to Maintain the Public Trust," which is not binding on either side—as creating any ambiguity as to the scope of the Exclusivity Provision.

[9] *See supra* note 6.

Ex. G (signed by Frederic Pocci of the Authority); Hand Cert., Ex. I (signed by Eric Derfner of Juster).

There is no evidence in the record upon which a reasonable juror could conclude that Juster unilaterally and/or unreasonably withdrew from pursuing a restructure and refinance of the Authority's 2003 leveraged lease before the Authority closed on the COPs transaction with NW Financial—on May 24, 2012. To the contrary, Mr. Pocci, Mr. Geffrard and Mr. Leanza all testified that Juster never withdrew from the proposed transaction. *See* Epstein Cert., Ex. 6, Geffrard Dep. Tr. at 101:11-16 ("Q. Did Juster ever unilaterally and unreasonably withdraw from pursuing the transaction? A. Not to my knowledge"); Epstein Reply Cert., Ex. F, Pocci Dep. Tr. at 243:19-244:18 ("Q. Did Eric at any time indicate to you that Juster wanted to withdraw from either the 144A or the 3(a)2? A. I don't think they ever indicated that, no."); Epstein Reply Cert., Ex. J, Leanza Dep. Tr. at 83:16-19 ("Q. And did Juster ever communicate to you that it wished to withdraw from pursuing a transaction with the Authority? A. To my recollection, no."). Though Defendant claims, *inter alia*, that "Juster's reaction in pursuing a 3a2 or a COPs transaction was lukewarm at best,"[10] Defendant has come forward with no evidence showing that the Authority ever deemed Juster as having withdrawn from the parties' transaction. To the contrary, evidence in the record shows that, regardless of the parties' differences, Juster continued to perform under the Term Sheet well after the Authority had begun communicating with NW concerning an alternative transaction and even after Juster's deal was suspended on January 20, 2012. For example, Mr. Geffrard of the Authority testified that, as late as April 18, 2012, he continued to have the impression that Juster remained willing to make significant adjustments to its proposals in order to meet the Authority's objectives in reducing the costs of

---

[10] (Def. 56.1 Stmt., 12).

their proposal. (Epstein Reply Cert., Ex. I, Geffrard Dep. Tr. at 274:19-276:23; Ex. K).

Moreover, Defendant concedes that, as late as early May 2012, the Authority was still actively considering financing through Juster. (Def. Responsive 56.1 Stmt., 15); (Hand Cert., Exs. P, BB).

In light of the foregoing, the Court concludes that: (1) the Exclusivity Provision—which is the only legally binding aspect of the Term Sheet—is clear and unambiguous,[11] (2) the Exclusivity Provision—which provides that "[t]he Authority agrees to work exclusively with Juster on the restructuring and refinancing of the Authority's 2003 leveraged lease"—contains

---

[11] Defendant urges the Court to consider evidence extrinsic to the Term Sheet to determine the parties' true intent—which, according to Defendant, was to limit the Exclusivity Provision to a private equity transaction. As previously stated, the Court may not consider extrinsic evidence where the terms of a written agreement are neither ambiguous nor uncertain. *See, e.g., Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.,* 195 N.J. 231, 238 (2008) ("If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists. In that case, a court may look to extrinsic evidence as an aid to interpretation."). Although Defendant has not demonstrated a legal basis upon which this Court should look beyond the plain language of the Exclusivity Provision of the Term Sheet, the Court has in any event considered the evidence presented by Defendant, which includes, but is not limited to:  the language of the RFQ, the proposed Term Sheet, an email sent by Michael Geffrard (of the Authority) to Eric Derfner (of Juster), dated July 21, 2011, testimony by the Authority's Executive Director Frederic Pocci, and the Resolution passed by the Authority's Board on October 20, 2011. At most, such extrinsic evidence suggests that the Authority initially sought an equity partnership to refinance its 2003 leveraged lease debt, and that the parties preliminarily contemplated use of one of the two transactions listed under Contemplated Transaction in the Term Sheet to accomplish this goal. But the parties subsequently—and *expressly*—agreed that the Contemplated Transaction was "subject to change and not final." In fact, there is no dispute that once the parties entered into their agreement, they proceeded to consider alternative financing options that were not listed under Contemplated Transaction—including but not limited to a COPs transaction. (Pl. 56.1 Stmt., 11; Def. Responsive 56.1 Stmt., 11); (Epstein Cert., Ex. 2 at No. 37). The only aspect of the agreed-upon Term Sheet that was *not* subject to change was the Exclusivity Provision, which made no reference, whatsoever, to the Contemplated Transaction or to any other particular type of financial transaction—private equity or otherwise. *See* Term Sheet, Hand Cert., Exs. G, I. Thus, even if the Court were to consider the extrinsic evidence upon which Defendant relies in support of its position, the Court would nevertheless conclude that parties did not agree—or intend—to limit the Exclusionary Provision to either the Contemplated Transaction (as defined in the Term Sheet), or to a private equity transaction, in general.

no express limitation to private equity transactions or to the Contemplated Transaction, as defined in the Term Sheet, (3) pursuant to the terms of the Exclusivity Provision, the only way that the Authority could have proceeded to restructure and refinance its debt under the 2003 leveraged lease agreement with an entity *other* than Juster during the 18-month period of exclusivity, without breaching said provision, is if Juster had "unilaterally and unreasonably" withdrawn from pursuing the transaction during said eighteen-month period, (4) based on the evidence in the record, no reasonable jury could conclude that Juster withdrew from pursuing a restructure and refinance of the Authority's 2003 leveraged lease before May 24, 2012 (the date on which the Authority closed on the COPs transaction with NW Financial), and (5) it is undisputed that on May 24, 2012—six months into Juster's eighteen-month exclusivity period— the Authority closed on a COPs transaction with NW Financial, restructuring and refinancing the same debt at issue in the Exclusivity Provision.[12]

There is no question—based on the extensive evidence in the record—that the Exclusivity Provision was the result of a significant business transaction between two sophisticated parties dealing at arm's length. Regardless of what Defendant may have intended when it agreed to the Term Sheet and/or Exclusivity Provision, the fact is that it did not express its alleged understanding in the discrete, legally-binding, provision that controlled its exclusivity obligations vis-à-vis Juster. There is simply no evidence before this Court that the parties intended to limit the Exclusivity Provision in the manner that Defendant now proposes.[13] "[I]t is

---

[12] (Pl. 56.1 Stmt., 19; Def. Responsive 56.1 Stmt., 19); (Epstein Cert., Ex. 2 at No. 53).

[13] To the extent Defendant intended to limit the Exclusivity Provision to the restructure and refinance of the Authority's 2003 leveraged lease debt *through a private equity transaction*—or even through the "Contemplated Transaction," as defined in the Term Sheet—Defendant could have sought to include this limitation in said provision during the negotiation process. For example, by comparison, the Exclusivity Provision contains a reservation of the Authority's right to engage in "other capital raising activities that are part of its ongoing capital investment

not the function of the court to make a better contract for the parties, or to supply terms that have not been agreed upon." *Graziano v. Grant*, 326 N.J. Super. 328, 342 (App. Div. 1999). Thus, the Court must enforce the Exclusivity Provision as written, giving its terms their plain and ordinary meaning. *See, e.g., Barr v. Barr*, 418 N.J. Super. 18, 32 (App. Div. 2011) ("In our examination, if we find 'the terms . . . are clear and unambiguous, there is no room for construction and the court must enforce those terms as written,', giving them 'their plain, ordinary meaning.' "). In light of the foregoing, the Court concludes that Defendant breached the Exclusivity Provision when it restructured and refinanced its 2003 leveraged lease debt with NW Financial on May 24, 2012—six months into the parties' agreed-upon period of exclusivity.

### b.    Enforceability of Term Sheet and/or Exclusivity Provision

Defendant argues that, even if the Exclusivity Provision were not limited to a deal involving a private equity partner, said provision is unenforceable because it: (1) violates public policy, (2) lacks proper offer and acceptance, (3) is missing essential terms such as price, and (4) was entered into based upon a mutual mistake of tax law regarding "phantom income." (Def. Opp'n Br. at 29).

---

programs. *See* Exclusivity Provision, Hand Cert., Exs. G, I ("This grant of exclusivity shall not in any way impede the Authority from engaging in other capital raising activities that are part of its ongoing capital investment program, nor from doing any other activities necessary for its efficient and cost effective operations."). In a similar fashion, the Exclusivity Provision *could* have stated that "this grant of exclusivity shall not in any way impede the Authority from restructuring and refinancing its 2003 leveraged lease debt through any type of transaction not listed as a Contemplated Transaction"—but the parties apparently did not negotiate for the inclusion of this type of language. *See, e.g., Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 43 (1960) ("Courts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made.").

*Void as to Public Policy*

As to its public policy argument, Defendant claims that "enforcing the Exclusivity Provision as interpreted by Juster would have forced the Authority to either accept a deal that was not in the best interest of their customers in violation of the governing law, or end the deal and be prevented from refinancing its debt for eighteen months, during which time the debt would have continued to accumulate and/or come due." (Def. Opp'n Br. at 32). Moreover, Defendant maintains that "enforcement of the Exclusivity Provision would benefit only Plaintiffs while injuring the rate-paying public . . . ." (*Id.* at 33).

"Contracts have been declared invalid because they violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality, or restrain trade." *Vasquez v. Glassboro Service Ass'n. Inc.,* 83 N.J. 86, 98-99 (1980). "An agreement is against public policy if it is injurious to the interest of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society and is in conflict with public morals." *Garlinger v. Garlinger,* 129 N.J. Super. 37, 40 (Ch. Div. 1974) (citations omitted). New Jersey caselaw is clear, however, in stating that "equitable relief is not available merely because enforcement of the contract causes a hardship to one of the parties." *Rosen v. Smith Barney, Inc.,* 393 N.J. Super. 578, 594 (App. Div. 2007). Thus, "the power of a court to declare a contractual provision void as against public policy must be exercised with caution and only in cases that are free from doubt." *Saxton Const. & Management Corp. v. Masterclean of North Carolina Inc.,* 273 N.J. Super. 374, 377 (Law Div. 1992).

Having carefully considered the parties' arguments, as well as the balancing test employed by the Appellate Division in *Saxton,* 273 N.J. Super. at 378, the Court finds that

enforcement of the Exclusivity Provision would not violate public policy because: (1) the Authority voluntarily agreed to be legally bound to the discrete terms of the Exclusivity Provision, (2) said provision did not require the Authority to accept any particular proposal, deal or rate increase by Juster; it merely required the Authority to work exclusively with Juster in refinancing and restructuring its already existing debt for a period of eighteen months, (3) after the expiration of the agreed-upon eighteen month exclusivity period, the Authority was free to refinance its 2003 leveraged lease debt in any manner (and with any entity) that it deemed fit, (4) there is no indication that enforcement of said provision would have the direct effect of violating any existing law,[14] and (5) enforcement of said provision encourages the performance of the contract between the parties, promotes efficiency in the sense that it sought to refinance the Authority's already existing debt, and is consistent with fair and honorable dealing between two sophisticated parties and their respective financial and legal advisors. Thus, the court declines to hold the Exclusivity Provision void as against public policy. *See generally Saxton,* 273 N.J. Super. at 377 ("[T]he power of a court to declare a contractual provision void as against public policy must be exercised with caution and only in cases that are free from doubt.").

### *Lacks Proper Offer and Acceptance*

Next, Defendant argues that the Exclusivity Provision is not enforceable inasmuch as there was no "meeting of the minds" because the parties signed different versions of the Term

---

[14] Because the Exclusivity Provision did not require the Authority to accept any particular proposal, deal or rate increase proposed by Juster, Defendant has failed to convince the Court that enforcement of the Exclusivity Provision has the direct effect of violating N.J.S.A. 40:14B-23 ("County and Municipal Water and Sewage Disposal Authorities; Service charges; determination; hearing") or N.J.S.A. 40:14A-1, et seq. ("County and Municipal Sewerage Authorities").

Sheet. In particular, Mr. Pocci, Executive Director of the Authority, executed the signature page of version 10 of the Term Sheet but attached the signature page to version 9. Eric Derfner of Juster signed the same signature page for version 10, but attached the fully executed signature page to version 10 of the Term Sheet. (*Id.*). In support of its position, Defendant cites to *Gross v. Yeskel,* 100 N.J. Eq. 293, 294 (1926), for the proposition that "[i]t is manifest that the parties to this agreement have not agreed to the same thing in the same sense, so that there was lacking in the situation the meeting of the minds of the contracting parties, which forms the essential element to the valid consummation of a contract."

It is well-settled that a "written contract is formed when there is a 'meeting of the minds' between the parties evidenced by a written offer and an unconditional, written acceptance." *Morton v. 4 Orchard Land Trust*, 180 N.J. 118, 129–30 (2004). A party may assent to the terms of an offer through either words or conduct. *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 436 (1992). As a preliminary matter, the Court notes that although Defendant refers generally to this section as "lacks a proper offer and acceptance," Defendant does not actually make this argument. In other words, Defendant does not present a meaningful argument concerning the mechanics of which side—it maintains—made the relevant offer, and which side failed to make an unconditional acceptance (and why). To the contrary, Defendant argues "even assuming that the other requirements for contract [were met], there was no meeting of the minds about the scope of the exclusivity provision." (Def. Opp'n Br. at 33-34). The Court will thus limit its analysis to whether there is evidence in the record upon which a reasonable jury could conclude that there was no "meeting of the minds."

Regardless of which side made the relevant offer (by submitting the final, agreed upon, version of the Term Sheet for its execution), there is simply no evidence before the Court that

*either* side failed to unconditionally accept the terms of the Exclusivity Provision. There is no dispute that both parties signed an agreement containing the same Exclusivity Provision. As previously stated, no changes were made to the Exclusivity Provision—the only legally binding aspect of the Term Sheet—between versions 9 and 10. (Pl. 56.1 Stmt., 8-9; Def. Responsive 56.1 Stmt., 8-9); (Hand Cert., Ex. G (signed by Frederic Pocci of the Authority); Ex. I (signed by Eric Derfner of Juster); Ex. V). Moreover, Mr. Pocci admitted in his deposition that no changes were made to the Exclusivity Provision between versions 9 and 10 of the Term Sheet. (Epstein Cert., Ex. 3, at 326:1-10).

Finally, and perhaps most critically, as discussed above, evidence in the record demonstrates that the parties—and, in particular, the Authority—recognized the validity of the Exclusivity Provision and, in fact, performed thereunder. For example, on March 6, Mr. Wolff (Chairman of the Authority) sent an email to Mr. Pocci (Executive Director of the Authority) stating: "Maybe we should just do the COPS deal and bring the issue with Derfner to a head by telling him we are doing a traditional deal which does not fall under the exclusivity." (Epstein Cert., Ex. 42). Similarly, on March 8, 2012, Jane Fallon (on behalf of Frank Leanza, the Authority's General Counsel) sent an email to Eric Derfner of Juster stating, in pertinent part: "The Authority continues to recognize Juster's Exclusivity (as defined in the term sheet between the parties) with respect to the Contemplated Transaction" (Epstein Cert., Ex. 23). Certainly, there is no evidence in the record suggesting that either party—much less the Authority— believed that they were not bound to the Exclusivity Provision by virtue of Mr. Pocci (on behalf of the Authority), having inadvertently attached the prior version of the Term Sheet (version 9) to his executed signature page (from version 10).

To the extent Defendant argues that there was no meeting of the minds as to the *scope* of the Exclusivity Provision, in particular, the Court finds that this is not a proper basis for rendering the entire provision unenforceable. In the words of the Chancery Division:

> [I]t is not necessary for a writing to contain every possible contractual provision to cover every contingency in order to qualify as a completed binding agreement. Some of these issues may be determined by the operation of law, or the parties may resolve such differences by a subsequent agreement or a contract may be silent in those respects. In any event a contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect. So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound. Such is the just and fair result[.]

*Bistricer v. Bistricer*, 231 N.J.Super. 143, 148 (Ch. Div. 1987) (quoting *Berg Agency v. Sleepworld*, 136 N.J. Super. 369, 376 (App. Div. 1975)). Here, the Exclusivity Provision is no less a contract because it failed to contain a clause limiting it to the Contemplated Transaction, or a contingency clause allowing Defendant to terminate the agreement if the restructure and refinance was not accomplished through a Contemplated Transaction. It is entirely unclear to the Court whether such contingency clause was omitted deliberately or inadvertently, nor does it matter. So long as the parties agree on essential terms and manifest an intention to be bound by those terms, any gaps left by the parties should not frustrate their intention to be bound. *See generally id.*; *Weichert,* 128 N.J. at 435.

In light of the foregoing, including evidence of the manner in which the Authority conducted itself after its Executive Director, Mr. Pocci, executed the signature page of version 10 of the Term Sheet, no reasonable jury could conclude that there was no "meeting of the minds" vis-à-vis the Exclusivity Provision. *See generally Weichert*, 128 N.J at 436 ("[W]hen an offeree accepts the offeror's services without expressing any objection to the offer's essential

terms, the offeree has manifested assent to those terms."). Thus, the Court declines to hold the Exclusivity Provision unenforceable on this basis.

### The Contract is Missing Essential Terms

Next, Defendant argues generally that the "Term Sheet that Juster seeks to enforce is . . . fatally defective because it lacks essential material terms such as price."[15] (Def. Opp'n Br. at 34). In support of its position, Defendant proceeds to list various aspects of the Term Sheet which, according to Defendant, "[do] not clearly distinguish what portions of it are supposed to be binding." (*Id.*). But Plaintiff does not seek to enforce the Term Sheet as a whole; Plaintiff seeks to enforce the Exclusivity Provision—which, the Court has already found to be the only legally-binding aspect of the Term Sheet. *See* Pl. 56.1 Stmt., 8-9; Def. Responsive 56.1 Stmt., 8-9; (Hand Cert., Ex. G (signed by Frederic Pocci of the Authority); Ex. I (signed by Eric Derfner of Juster); Ex. V) ("This letter is not contractual in nature, and neither this letter nor any subsequent conduct of the parties . . . shall create or give rise to any legally binding obligation to lease, purchase, sell or any other legally binding obligation other than as described under "Exclusivity" above. . . .").

In any event, the Court declines to hold the Exclusivity Provision unenforceable simply because it failed to include a particular price. The Exclusivity Provision is not a service agreement for the actual restructure and refinance of the 2003 Leveraged Lease debt; rather, it establishes an exclusive relationship between both parties—i.e., a relationship in which the Authority promised to work exclusively with Juster in the restructure and refinance of said debt

---

[15] Defendant does not specify any other essential terms that are purportedly missing from the Exclusivity Provision; thus, the Court will limit its analysis to the price term.

for a period of eighteen months; in consideration for this promise, Juster and its professionals expended substantial time and effort working towards an agreeable refinance deal. (Pl. 56.1 Stmt., 10, 11; Def. Responsive Stmt., 10, 11). Conceivably, the Authority could have satisfied the terms of the Exclusivity Provision, without ever having to pay a "price" to Juster, by choosing not to refinance and/or restructure said debt until *after* the eighteen-month period of exclusivity.[16] The Exclusivity Provision did not, itself, require the Authority to enter into a future contract with Juster concerning the refinance; thus, it need not specify the terms of those future contracts—including but not limited to potential price terms—in order to be deemed enforceable. *See generally Echols v. Pelullo*, 377 F.3d 272, 276 (3d Cir. 2004) (analyzing promotional agreement under Delaware law).

For these reasons, the Court does not find that the price term was an essential term to the parties' legally binding agreement—i.e., the Exclusivity Provision. *See generally Weichert*, 128 N.J. at 435 ([I]f parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract."). Defendant's argument in this regard is therefore rejected.

### *The Contract was based on a Mutual Mistake of Tax Law*

Lastly, Defendant argues that "at its core, the dispute between the parties in this case involves a mistake of federal tax law." (Def. Opp'n Br. at 35). In particular, Defendant explains that, in negotiating the Term Sheet, both parties had an assumption that the Contemplated Transaction, if not tax neutral, would at least not create tax problems for Juster or the Authority.

---

[16] This Court's hypothetical statement in this regard should not be construed, by either side, as a legal determination (relevant to any other issues in the case, such as damages). It is merely a hypothetical statement—nothing more.

(*Id.*). "Unfortunately, it became increasingly obvious that there would be an unexpected tax burden for Juster in the form of so-called "phantom income tax." (*Id.* at 36). According to Defendant, this amounts to a mutual mistake of law.

Generally speaking, "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected." *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 609 (1989) (quoting Restatement (Second) of Contracts §§ 152, 155).

Defendant's argument is premised entirely on the theory that the parties were not aware of the "phantom tax issue" until after they executed the Term Sheet (November 7, 2011). Both sides rely on different aspects of the deposition testimony by Mr. Geffrard, who served as the Authority's financial advisor in connection with the RFQ, in support of their respective positions. Plaintiff cites to a portion of Mr. Geffrard's testimony wherein he states that the issue first came up in October 2011. *See* Epstein Reply Cert., I at 138:15-139:6. Defendant cites to a portion of Mr. Geffrard's testimony wherein he states that the issue first came up in December 2011. *See* Hand Cert., Ex. F at 132:16-134:10. Defendant has not submitted an affidavit by Mr. Geffrard to clarify the apparent discrepancy in his own testimony concerning the precise timing of when the phantom income tax issue arose.

Separate and apart from the Geffrard deposition testimony, Plaintiff cites to the subject line of an email dated November 7, 2011 from Ned Flynn to Eric Derfner which states: "Accepted: RE: Fwd: NHSA – cash flows/phantom income." (Epstein Reply Cert., Ex. Q). Based on this evidence, when viewed as a whole, no reasonable jury could conclude that Juster

was unaware of the potential phantom income tax at the time it agreed to the terms of the Exclusivity Provision.

In any event, even assuming, *arguendo*, that the parties had entered into the Term Sheet with an incorrect assumption as to the implications of the "phantom income tax" on the Contemplated Transaction or any other particular types of transactions, this would relate to the ultimate cost of the refinance transaction, which, as discussed above, was not an essential term of the Exclusivity Provision. Moreover, the Court reiterates that the Exclusivity Provision did not bind the parties to the Contemplated Transaction or to any other particular type of transaction—it simply bound the Authority to work exclusively with Juster in the restructure and refinance of its 2003 leveraged lease debt for a period of eighteen months. There is no dispute that the phantom income tax issue did not apply to a COPs transaction. Nor is there any dispute that the parties considered various potential transactions, including a COPs transaction. Thus, the Court cannot conclude that any mistake as to the existence of a phantom income tax issue would have a material effect upon the parties' agreed upon exchange of performance pursuant to the Exclusivity Provision—which, conceivably, could have been carried out in a transaction that did not implicate the phantom income tax issue. Thus, the Court finds that the Exclusivity Provision would not be voidable on such a basis.


In light of the foregoing, Plaintiff's motion for summary judgment as to its breach of contract claim is granted. Defendant's cross-motion for summary judgment as to this claim is denied.

## 2. Count Two—Breach of Implied Covenant of Good Faith and Fair Dealing

Next, Plaintiff moves for summary judgment as to its breach of implied covenant of good faith and fair dealing claim. Under New Jersey law, all contracts include an implied covenant that the parties to the contract will act in good faith. *See Sons of Thunder. Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997). The covenant "mandates that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 254 (App. Div. 2002) (quotations omitted). "A good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. It follows, then, that a contract would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming the breach." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236 (2001). Warning against overly broad constructions of the covenant of good faith, the New Jersey Supreme Court held that "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive." *Brunswick Hills Racquet Club, Inc. v. Rte. 18 Shopping Ctr. Assoc.*, 182 N.J. 210, 231 (2005).

Defendant argues that the implied covenant of good faith and fair dealing does not apply in this case because the parties' relationship was not governed by an enforceable contract. Having confirmed the enforceability of the Exclusivity Provision, as set forth above, the Court rejects this argument without further discussion. *See generally Wade v. Kessler Institute*, 172 N.J. 327, 340 (2002) ("Every contract contains an implied covenant of good faith and fair dealing.").

Turning now to the claim at issue, the crux of Plaintiff's argument in support of its motion for summary judgment is that, pursuant to the parties' agreement, it spent significant time and effort providing numerous financial models and deal documents to the Authority, including but not limited to a COPs deal, and that the Authority, after rejecting a COPs deal with Juster, ultimately restructured and refinanced its 2003 leveraged lease debt through a COPs transaction with another entity—NW Financial—behind Juster's back.

Having carefully considered the parties' arguments and the evidence in the record, the Court concludes there is a genuine issue of material fact in dispute as to the timing of the Authority's decision to proceed with NW Financial. Defendant has come forward with evidence suggesting that: (1) as of April 2012, the Authority was still actively considering financing through Juster, (Hand Cert., Ex. BB); and (2) the final decision to proceed with NW Financial was not made until May 3, 2012, (Hand Cert., Exs. P, R). On the other hand, Plaintiff has come forward with evidence suggesting that the Authority's decision to proceed with NW Financial was made as early as February 2012. *See* Epstein Cert., Ex. 38. Kraft Dep. Tr. at 151:1-152:16 (testifying that the decision to proceed with a restructuring and refinancing pursuant to COPs without Juster was made by Mr. Pocci and communicated to Mr. Kraft, the Authority's bond counsel, on or around February 2012). Plaintiff cites to other evidence in the record to corroborate this. *See, e.g.,* Epstein Cert., Ex. 39; Ex. 40 at 179:1-5) (containing email from Mr. Enright of NW Financial, dated February 24, 2012, stating "Jusy [sic] got a call from Fred [Pocci], he says we are all on the same page now, COPs all the way. . . ."); Epstein Cert., Ex. 42 (referring to the Authority's COPs kickoff meeting, held on March 7, 2012, and noting that Eric Derfer was not invited); Epstein Cert., Ex. 43 (containing email dated March 8, 2012, sent by

Mr. Enright of NW Financial to two other individuals at NW Financial, stating that "we have convinced North Hudson to abandon a planned private lease deal and do a COPs deal.").

It is clear, based on the evidence in the record, that at some point between November 2011 and May 2012, the Authority changed its views on a COPs transaction and its business strategy vis-à-vis the restructure and refinance of its 2003 leveraged lease debt. Although the implied covenant of good faith and fair dealing did not necessarily obligate the Authority to disclose its changing business strategy to Juster,[17] if the trier of fact determines that the Authority had in fact decided to proceed with NW Financial in a COPs transaction and then withheld such information from Juster while either simultaneously encouraging Juster to continue to invest its resources in other potential transactions pursuant to the Exclusivity Provision, or even with knowledge that Juster was continuing to perform under the Exclusivity Provision to its detriment, then such actions by the Authority *could* amount to a breach of the implied covenant of good faith and fair dealing under New Jersey law. *See Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.,* 69 N.J. 123, 130 (1976);[18] *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.,* 457 F.3d 312, 330

---

[17] *See, e.g., Elliott,* 457 F.3d at 330 ( (3d Cir. 2006) (referring to *Bak-A-Lum* decision and noting that "it was not the mere withholding of termination plans that gave rise to the breach [of the covenant of good faith and fair dealing]; instead, the New Jersey Supreme Court explained that the defendant breached the covenant [of good faith and fair dealing] because it kept silent while simultaneously encouraging the plaintiff's substantial investment in merchandise and facilities expansion.").

[18] In *Bak-A-Lum,* 69 N.J. at 130, the New Jersey Supreme Court held, in pertinent part:

> While the contractual relation of manufacturer and exclusive territorial distributor continued between the parties an obligation of reciprocal good-faith dealing similarly persisted between them. In such circumstances defendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith of which we have spoken. As

(3d Cir. 2006) (referring to *Bak-A-Lum* decision and noting that "it was not the mere withholding of termination plans that gave rise to the breach [of the covenant of good faith and fair dealing]; instead, the New Jersey Supreme Court explained that the defendant breached the covenant [of good faith and fair dealing] because it kept silent while simultaneously encouraging the plaintiff's substantial investment in merchandise and facilities expansion.").

The parties' cross-motions for summary judgment as to this claim are therefore denied.

## B. Defendant's Cross-Motion for Summary Judgment

### 1. Counts Three and Four—Restitution, Unjust Enrichment and Quantum Meruit

Counts Three and Four assert quasi-contractual claims of restitution, unjust enrichment and quantum meruit. Defendant moves for summary judgment as to these claims. Such claims, pled in the alternative, are indisputably based on the same facts underlying Plaintiff's breach of contract claim—namely, the services Juster provided to the Authority in connection with the restructure and refinance of the Authority's 2003 leveraged lease debt.

"It is a 'well settled rule that an express contract excludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject." *Moser v. Milner Hotels*, 6 N.J. 278, 280 (1951). Similarly, "recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties." *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982).

Because the relief Plaintiff seeks in Counts Three and Four—recovery for services it rendered to the Authority in connection with the restructure and refinance of the Authority's

such it must be given substantial weight in determining the reasonableness of a period of notice of termination of the distributorship.

2003 leveraged lease debt—is governed by the terms of the Exclusivity Provision, Plaintiff may not recover under a quasi-contract theory. In opposition to Defendant's motion, Plaintiff agrees to the dismissal of these claims to the extent its motion for summary judgment as to its breach of contract claim is granted. In light of the foregoing caselaw, and given this Court's holding that the parties' relationship was governed by an enforceable contract, Defendant's motion for summary judgment as to these claims is granted. Counts Three and Four of Plaintiff's Complaint are hereby dismissed *with* prejudice.


### 2. Punitive Damages

Defendant moves for dismissal of Plaintiff's request for punitive damages.

"To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 49 (1984) (citation omitted). "With rare exception, punitive damages are not available in an action for a breach of contract, and have been restricted to tort actions." *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 369-370 (1988). "[T]he decision to award [punitive] damages and the amount" of such damages is "within the sound discretion of the" factfinder." *Leimgruber v. Claridge Assocs. Ltd.,* 73 N.J. 450, 456, (1977).

In construing New Jersey law, the Third Circuit has clarified that "[u]nder New Jersey law breaches of contract, even if intentionally committed, do not warrant an award of punitive damages in the absence of a showing that defendant also breached a duty independent of that created by the contract. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1194 (3d Cir. 1993);

*see also Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J. Super. 437, 449 (App. Div.) ("Where the essence of a cause of action is limited to a breach of ... a [commercial] contract, punitive damages are not appropriate regardless of the nature of the conduct constituting the breach."), *cert. denied*, 71 N.J. 503 (1976). Plaintiff concedes that none of its claims are premised on the existence of any duty independent of the contract—the Exclusivity Provision. In light of the foregoing, the Court concludes that punitive damages are not available in this breach of contract action. *See id.*[19] Defendant's motion for summary judgment as to the punitive damage claims emanating from Plaintiff's contract-related claims is granted.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment [Docket Entry No. 71] is granted as to Count One (breach of contract—liability only) and is denied as to Count Two (breach of the implied covenant of good faith and fair dealing). Defendant's cross-motion for summary judgment [Docket Entry No. 84] is denied as to Counts One and Two and is granted as to Counts Three (restitution and unjust enrichment), Four (quantum meruit), and as to Plaintiff's request for punitive damages. This matter will proceed to trial solely as to: (1) the

---

[19] Nor does the Court conclude that this case—which presents an isolated breach of contract—presents the type of egregious, aggravated set of facts that would otherwise warrant an award of punitive damages. *See, e.g., Sec. Aluminum Window Mfg. Corp. v. Lehman Assocs., Inc.*, 108 N.J. Super. 137 (App. Div. 1970); *New West Caldwell Dental Group, PA v. PARS Enterprises, LLC,* 2010 WL 3185639, at *11 (N.J. Super. App. Div.) ("The judge concluded that PARS's conduct, '[a]s repugnant as [it] may [have] be[en], ... cannot be seen as the type of "evil-minded act" or the product of "actual malice" that is the hallmark of punitive damages.' We find no mistaken exercise of the judge's discretion.").

issue of damages as to Count One (breach of contract), and (2) Count Two (breach of the implied covenant of good faith and fair dealing) in its entirety.

An appropriate Order accompanies this Opinion.

s/ Jose L. Linares
Jose L. Linares
United States District Judge

Date: January 17, 2014